CONTINENTAL OIL & COTTON COMPANY v. W. O. SCOTT.

Decided May 23, 1908.

**1.—Master and Servant—Defective Machinery—Assumed Risk.**

In an action by a ginner against a gin company for damages for personal injuries received while tending a gin and caused by defective machinery, evidence considered, and held to show, as matter of law, that plaintiff assumed the risk of using the machinery, and to require a peremptory instruction for the defendant.

**2.—Same—Instructions of Master—Case Distinguished.**

Where defects in machinery are so open and obvious as to be matter of common knowledge and to impress anyone, even though he be unskilled, that the use of the machine is thereby rendered dangerous, he can not excuse himself for a continued use of the machine by an alleged reliance upon the assurance of his master that the use of the machine was not dangerous. Gulf, Colorado & Santa Fe Railway Co. v. Wells, 16 S. W. 1025, distinguished.

Appeal from the District Court of Taylor County. Tried below before Hon. J. H. Calhoun.

*Alexander & Thompson* and *Hardwicke & Hardwicke,* for appellant. —The court should have directed a verdict for defendant, because the plaintiff testified that the defect complained of in the gin stand was open, patent and well known to him, as well as the effect of such defect in permitting the gin stand to fall as it had on at least one occasion prior to the accident. Further, the testimony of plaintiff was, that at the time of the accident he was a ginner of fifteen years' experience; that he had more opportunity to discover the defect than any other person working in or around the gin, and all of the other testimony introduced tended to corroborate the testimony of the plaintiff to the point that with knowledge he assumed the risk incident to the service as it was conducted, and especially the risk from the condition of the gin stand, expressly complained of. Ft. Worth Stock Yards Co. v. Wittenburg, 78 S. W., 363; Trinity & B. V. Ry. Co. v. Perdue, 101 S. W., 486; St. Louis, S. W. Ry. Co. v. Brisco, 99 S. W., 1021; Missouri, K. & T. Ry. Co. v. Hanson, 90 S. W., 1122; Day v. Houston & T. C. Ry. Co., 101 S. W., 1044; Klutts Bros. v. Gibson, 83 S. W., 404; Ladonia Oil Co. v. Shaw, 65 S. W., 693; Quill v. Houston & T. C. Ry. Co., 93 Texas, 616; Parish v. Missouri, K. & T. Ry. Co., 76 S. W., 235; Joske v. Irvine, 91 Texas, 575; Choate v. San Antonio & A. P. Ry. Co., 44

S. W., 69; Smith v. Armour & Co., 84 S. W., 675, with the authorities reviewed therein by Chief Justice Connor; Poindexter v. Kirby Lbr. Co., 101 Texas, 322; Kirby v. Cartwright, 20 Texas Ct. Rep., 514; Gulf, W. T. & P. Ry. Co. v. Wittnebert, 108 S. W., 153; Gulf, C. & S. F. Ry. Co. v. Walters, 20 Texas Ct. Rep., 619.

*Wagstaff & Davidson,* for appellee.—The appellant having assured the appellee that the gin stand was all right and not dangerous after appellee called the attention of appellant to the defect in the gin stand, appellee had a right to rely on the superior knowledge of appellant and to continue working at his post. Gulf, C. & S. F. Ry. v. Wells, 16 S. W., 1027, 1028, 79 S. W., 727; 26 Cyc., p. 1213.

PRESLER, ASSOCIATE JUSTICE.—Appellee, as plaintiff below, sued appellant, as defendant in the District Court of Taylor County, Texas, for damages on account of personal injuries sustained by plaintiff on the 29th day of September, 1905, while employed by the defendant company as a ginner at Merkel, in Taylor County, Texas. It was alleged that plaintiff was injured on account of a defective, broken and dangerous gin stand, the defect being that the breast of the gin stand when raised would not remain up on account of the fact that the machinery was worn, broken and defective; that plaintiff did not know of this defect, but that defendant did know of the defect and failed to warn the plaintiff of the danger, but represented to the plaintiff that it was all right, and that defendant required the plaintiff to raise the breast of the gin stand and to use a small stick to clean the saws connected with the gin stand—by reason of all which alleged negligence plaintiff was injured, resulting in the laceration and loss of his arm by being cut by the gin saws due to the breast of the gin stand falling and carrying his hand into the saws thereof.

For answer, besides the general denial, defendant specially plead that if there was any danger connected with or incident to the operation of the gin stand, the same was known to plaintiff, in that he was an experienced hand, and that the alleged defects were patent, open and known to plaintiff, and such defects, if any, were not known to this defendant. For further answer defendant plead that the injuries of plaintiff were due to his own want of care and negligent acts, which were the direct and proximate cause of the injuries, and precluded any recovery. Defendant further plead that the injury to plaintiff was the result of his violation of instructions which were given to him, namely, not to expose his hands in cleaning the gin saws, but to use the stick and block.

A trial of the case resulted in a judgment for plaintiff for the sum of three thousand dollars. Defendant's motion and supplemental motion for a new trial were overruled, to which order exception was taken and in open court notice of appeal was given by defendant to the Court of Civil Appeals for the Second Supreme Judicial District. On motion, orders were entered by the court, granting twenty and thirty days time, respectively, in which to prepare the record for appeal. The appeal has been duly perfected, and the case is presented herein on the following assignments of error.

Appellant's first assignment of error is as follows: "The honorable trial court erred in refusing defendant's special charge No. 1, in which the court was requested to direct a verdict for the defendant, because upon the uncontradicted and undisputed testimony plaintiff should have been held precluded from any recovery as a matter of law, in that the undisputed evidence shows that he was an experienced ginner, and the alleged defect in the machinery of which he complained was open, patent and well known to him, together with the effect of such condition in the machinery, and the evidence was undisputed that with such knowledge he assumed the risk incident to the business as conducted. His own testimony was too inconsistent and contradictory to sustain an issue in his behalf, in that on former trial it is shown he testified he was holding the gin breast at the time of the accident, whereas, on last trial he testified to contrary, besides other testimony discrediting him as a witness, and evidencing his contributory negligence."

We are inclined to the opinion that the trial court erred in refusing at the request of appellant to give a peremptory charge to the jury to return a verdict for the defendant, and that plaintiff's assignment of error as hereinbefore set out should be sustained, the plaintiff having testified that the defect complained of in the gin stand was open, patent and well known to him, as well as the effect of such defect in permitting the gin stand to fall as it had on at least one occasion prior to the accident. Further, the testimony of plaintiff was that at the time of the accident he was a ginner of fifteen years' experience; that he had more opportunity to discover the defect than any other person working in or around the gin, and all of the other testimony introduced tended to corroborate the testimony of the plaintiff to the point that with knowledge he assumed the risk incident to the service as it was conducted, and especially the risk from the condition of the gin stand, expressly complained of.

Plaintiff testified that "the gin stand was defective, because the small bar that keeps the lever from working back and forth lengthwise of the stand had been broken off. I don't know as I can exactly say when I noticed this bar being broken off, but I had spoken to the superintendent either the day of the accident or the day before, and told him that bar was off; I don't clearly remember what he said in reply. I came to learn of this defect in the gin stand by seeing that bar off." Plaintiff further testified: "My way of unchoking a gin was to take the top breast off, leaving the saws visible, and I was doing that, and the superintendent, Mr. Johnson, came around and told me not to do that; that it was taking up too much time, but to take a stick and raise the breast and job it in the gin that way (illustrating), and he says the saws will then take it off. I told him that I had never done that before in my life; and so the first opportunity I did that—the first stroke I made a gin breast fell down and taken my arm off. The guide bar was off the gin stand; that is a bar that goes up and holds the side of the breast— a lever that comes up there about two inches wide—a little slide coming up by the side of it, and that lever works in this slot, and that keeps the bar from wabbling off that little catch or tit there for it to rest on; and this guide bar was completely off and did not keep the lever from wabbling, and this breast fell off. I never examined the notch in the

lever; but this guide was gone; it had dropped off and was just hanging down; it was placed there to keep the lever from wabbling out of its place; I called the superintendent's attention to that guide being off that day or the day before, I am not positive which; that is the first that I knew of it being off. The superintendent, Mr. Johnson, told me that it was all right, to go right on ahead; that the gin was all right. There is a bottom breast that holds that top breast off and that lets all of the cotton out of the roll, and then you see nothing but the saws. The lint sticks to the ribs if there is any there, and if you lift up the breast you can see anything down to the bottom of the breast, and he instructed me to raise that lever and take a stick and job in there. It takes more time to take off the top breast; you have to then form another roll; still, I do not know whether it does take so much more time. When you shove this lint up in the ribs it is liable to cause such friction as to set the gin afire, and I called his attention to that. I got my right hand caught in the gin. I do not know what kind of a stick it was; it was just a little stick lying there in the hall between the two gin batteries; I do not know how it come there; I never saw it before in my life, and I just picked it up and shoved it up in the gin; I do not know how far my hand was up in the gin; the breast came down the first stroke I made; I can not tell how hard or how easy it went; the first stroke I made it was gone, and that is all I can tell about it. I have run gins off and on for fifteen years—just a laborer around gins. I am not an educated man—I suppose not; I educated myself; I went to school about six months; I am not a machinist; don't know much about machinery. I never followed the occupation of fixing or repairing gins. . . . I had been running gins up to the time I took this employment, off and on for about fifteen years; not at it every year. In one sense, I told Mr. Guitar that I had had experience as a ginner; in one sense of the word I am a ginner. I had been running the gins in question from the 11th of September, to the 29th, daily. The lever that I spoke of at the side of the gin could be easily seen; it comes right up by the side of the gin; you don't have to remove anything to see it—right open before your eyes; I could see that it was loose, and called the superintendent's attention to it; I had seen it drop down once before that I knew of, and don't recollect whether more than that or not. The purpose of this lever was to hold the breast up; suppose that is what it was put there for in the operation of the machinery. My idea in calling the superintendent's attention to that was that it was off; I thought that it would let the breast fall down; it would let it down. . . . The superintendent of the gin, Mr. Johnson, had authority to direct me where to work and to control me in the exercise of my duties. I did not have control of the hands all the way through; it takes two to make a contract. I did not tell him that I would, or would not. He told me to see that the hands worked. He saw me there working with the saws where they were choked, with the top breast off, and he told me to use a stick for that, and not to take the breast off; that it was taking up too much time to take the top breast off, but to take a stick and job up there in the gin; I can not tell what kind of a stick, but the stick was about twelve inches long; I may have testified on the former trial that it was fifteen inches long—somewhere in the neighborhood of that; it was just

a stick lying there in the hall that I picked up and made the job with; I don't know whether he had used the stick there before he showed it to me or not; he did not take the stick and show me how to use it. Of course, a man would have sense enough not to put his hands on the saws; when I raised the top breast up there was no danger of letting the breast down on me; I had never used the stick that way before, and don't know whether he intended it as a safeguard or not; he did tell me this before I was hurt. The reason I was hurt, the gin breast fell down and caught my hand, and the reason it fell down was because that bar or guide was off and the lever not properly adjusted; it fell down, but I do not know whether it fell just like it did before when I observed it or not; I never knew it to fall up; certainly it would naturally fall downward. That was what that guide was there for—to sustain that bar or lift. I did testify, I suppose, in my deposition, that I knew of no one there that knew more about that gin stand than myself, for I run the gins myself, and I do not know what the other fellows knew; I don't know of anybody else that knew of this to fall down there before . . . When I got both these breasts up I depended on that lever to hold them up; that is what it was put there for; and by pulling it it raises both the top and lower breasts, and the purpose of that little slot or guide is to keep the lever from giving, so as to keep the breast up; the lever is about an inch wide and something like a quarter of an inch thick, and that come up to the sides of the end of the gin stand, working in a little groove and hooks over that little tit, and this bar or guide that I speak of was for the purpose of keeping it from slipping, and if it was in position it would not slip; that is what it was put there for. It had slipped on me before this; one time it fell before; I knew it was there for that purpose; I knew it was not then there, and I called their attention to it. . . . Of course, had I been using a stick fifteen inches long and reaching in there for the purpose of cleaning the gin, my hand would have been fifteen inches further from the saws than it would had I been using my fingers for the purpose of cleaning it. I can not tell where my hands were at the time, or where I had that stick; I just reached back and got the stick and made a punch. I can not tell whether I had hold of the end or in the middle of the stick, and the breast fell down on me when I first made the job; evidently, I had hold of the stick by the end close to the saws; I just picked it up and used it to push that lint up by instructions given me; I don't know that I paid very much attention to how I took hold of that stick when I picked it up; I found it down there in the gangway . . . the stick was about fifteen inches long, or a little longer possibly. . . ."

J. W. Maxwell, witness for defendant, testified: "My business inside was merely a superior, to notice if all seemed to be working well. Mr. Scott had charge of the gin stands and thought himself competent to attend to same, and so expressed himself." This witness also testified to various acts of taking unnecessary risks and of carelessness in so doing on the part of appellee Scott. On one occasion he states: "I saw Mr. Scott down on his floor where his duty lay, off and on, every day I was there, until the accident happened. Several times during my oversight of the ginnery I had seen him put his bare hands between the ribs and the breast of the gins whilst they were at work, picking out

lint from the ribs below the saws, and expostulated with him about it. . . . He replied, 'I've been working at the business for some years, and am not going to get hurt.' "

Fred Guitar, witness for defendant, stated: "When I employed Mr. Scott he told me he had had several years' experience; was a thorough ginner."

J. L. Johnson, witness for defendant, testified: "I looked after some twenty gins for the company at that time; I think I brought Mr. Scott to the Merkel gin and put him to work; I took him over from Abilene in a buggy, I believe. At that time Mr. Scott had the management of the gin hands inside the gin in my absence; I made him manager when I was absent. . . . Scott was a good ginner and seemed to understand his business all right; but I saw him doing several things there that I would not like myself to do, or any one about it. Sometimes a gin will get choked up, get lint in the ribs, and instead of his using a stick and punching that lint out, he would use his fingers; and I says to him: 'Will, you ought not to do that;' I says, 'If you do that, maybe some time when I go off and come back will find you lying out dead and all cut to pieces.' I says, 'Those breasts are liable to drop at any time,' and told him not to monkey around those saws while they were running. We had just a little stick to punch the lint out, about eighteen inches long—something like that; and then we used another block that we put under the breast in case it should drop. That lever sets on a little notch, and sometimes the shaking of the machinery will cause that breast to drop, and when that block is used, in case the breast should happen to drop, it could not catch his fingers. There was a block there; I think maybe the block I had there was a foot long—the block we used under the breast. I don't know what Mr. Scott was using at the time he was hurt."

It is true appellee testifies that he did not know of the danger, but we are inclined to hold that his knowledge and experience obtained by many years' work in running and operating gin stands, as appears from the testimony, clearly disproves the truth of this declaration on his part. Upon a thorough examination of the case of Gulf, Colorado & Santa 'Fe Ry. Co. v. Wells, 16 S. W., 1025, chiefly relied on by appellee and referred to by him as being much similar to the case at bar, we are of the opinion that said case is clearly to be distinguished from the one under consideration in that the appellee in this case was an experienced gin man, thoroughly conversant with the proper method of operating gin stands and of the appliances and methods necessary to be used in preventing injuries to persons operating them. In fact he appears to have been, from the evidence, about the best informed and most experienced gin man connected with the establishment. We note, however, that it appears in the evidence and is referred to in appellee's brief that he was an uneducated man. We are unable, however, to see what bearing his lack of literary or classical education could possibly have on any issue in this case. He appears to have been a thoroughly experienced gin man, which is material, while in the Wells case there is evidence in the record, as remarked by the court rendering the opinion, tending to show that appellee in that case was a raw and inexperienced hand and that such fact was known to the section foreman;

that he had only been in railroad service three or four months prior to the accident. While we regard the opinion of Judge Fisher as having been overruled, instead of adopted as stated by appellee, by the Supreme Court of Texas, we are disposed to concede that this action of the Supreme Court was upon another and a different question and one not involved in this case, and that the excerpt quoted from Judge Fisher's opinion, if extended sufficiently to take in all that he said in that connection, is a correct annunciation of law and applicable to this case. The quotation is as follows: "The servant is not called upon to desert his master's service for any defect he may discover in the machine he uses. The defect may not be of such a character as would indicate danger to an ordinarily prudent man, and, if this be so, why is not the servant justified in relying upon the superior knowledge of his master, and resting in safety upon his assurance that the use of the machine, with its defect, is not dangerous?" In immediate connection with this quotation and following the same the court further observed: "There may be defects in machinery of such character that danger would be inferred under the well known laws governing matters that are of common knowledge to all, or the defect may be of such character that would, in the nature of things, impress even an unskilled man that a use of the machine is thereby rendered dangerous. In such cases the declarations of the master that the defect does not render a use of the machine hazardous would avail the servant nothing, because from his knowledge of the fact of danger the representation appears false. He is not misled by the master's declaration to assume risks of which he was ignorant. If the employe be ignorant of the danger, or it is not apparent, or the defect is of such a character that danger would not be implied, we think the servant can safely rely upon the assurance of the master that a use of the machine with its defects is not dangerous."

We think that the law as above stated is clearly applicable to the facts of this case and sustains our conclusion that the appellee in this instance clearly assumed the risk incident to the continued use of a defective and dangerous machine. The duty of the master to exercise ordinary care to furnish suitable and safe machinery is well established, but conceding this, and conceding a failure of the master in this respect, it is nevertheless true that if the servant knows, or by the exercise of ordinary care for his own safety would have known, of the defect and failure of which he complains and of the danger of the continued use of the defective machine, and continues to use the same without promise on the part of the master of guarantee against injury or of mending the machine, he assumes the risk arising from the failure of the master and can not recover for injuries incurred thereunder. Smith v. Armour Co., 37 Texas Civ. App., 633, with the authorities reviewed therein by Chief Justice Conner.

We therefore conclude, as indicated above, that this cause should be reversed and here rendered for appellant, which is accordingly done.

*Reversed and rendered.*